UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA             :

    -v.-                                                  :                    S1 07 Cr. 961 (LBS)

OLIVIA JEANNE BOWEN, et al.          :

              Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S RESPONSE TO DEFENDANT NOEMI DODAKIAN'S PRETRIAL MOTIONS


PREET BHARARA
United States Attorney
Southern District of New York


HOWARD S. MASTER
RYAN P. POSCABLO
Assistant United States Attorneys

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

    -v.-                                            :                    S1 07 Cr. 961 (LBS)

OLIVIA JEANNE BOWEN, et al.              :

              Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S RESPONSE TO DEFENDANT NOEMI DODAKIAN'S PRETRIAL MOTION

The Government respectfully submits this response to the motion of defendant Noemi

Dodakian ("Dodakian" or "defendant") to suppress evidence seized during the execution of two

search warrants: the first, a search warrant issued on May 29, 2008 to seize and search the e-mail

account "prosper40@comcast.net," (the "Dodakian E-mail Account") as well as other e-mail

accounts (the "E-mail Search Warrant"),[1] and the second, a search warrant issued on August 5,

2008 and executed on August 6, 2008 authorizing the search for and seizure of certain items

contained within Dodakian's residence at 27 Jefferson Drive, Ridgefield, Connecticut (the

"Residence Search Warrant").[2]  The motion also argues that the two counts of the Indictment are

---

[1] A copy of the E-mail Search Warrant and supporting Affidavit of Kevin Irwin are attached hereto as Exhibit A.

[2] A copy of the Residence Search Warrant and the supporting Affidavit of Erin Zacher are attached hereto as Exhibit B.

misjoined and should be severed under Fed. R. Crim. P. 8 and 14.  For the reasons set forth

below, Dodakian's motions are meritless and should be denied.[3]

## I.     BACKGROUND

### A. The Charged Offenses

Dodakian, along with four other named defendants, was charged in a two-count

Indictment with conspiracy to commit wire fraud, in violation of Title 18, United States Code,

Section 1349 (the "Indictment").[4]  Dodakian and defendant Bowen are named in both counts,

while defendants David P.J. Norman, a/k/a "Jim Norman," Ingram, and Chong Shing Wu are

named in only one of the two counts.  As described in the Affidavit of FBI Special Agent Kevin

Irwin, submitted in support of the E-mail Search Warrant (the "Irwin Affidavit"), the Indictment

arises out of the investigation of two interrelated fraudulent schemes that are believed to have

defrauded over 100 victims of more than $5 million.  Both of the schemes are "advance fee"

schemes, a common fraudulent scheme under which victims are induced to pay money to

someone in anticipation of receiving something of greater value, such as a loan, contract,

investment, or gift, and then receive little or nothing in return.  (Irwin Aff. ¶ 7).  Specifically,

---

[3] The Court also authorized defendants Olivia Jeanne Bowen and Robert Ingram to join Dodakian's motions, to the extent they may be applicable to them.  While the challenge to the Residential Search Warrant is unique to Dodakian (and Ingram has already challenged a search warrant that was issued by the District of Arizona for his residence), the challenges to the E-mail Search Warrant are common to Dodakian, Bowen, and Ingram, as warrants to search certain of Bowen's and Ingram's e-mail accounts were also authorized by the same search warrant affidavit, using identical language in the search warrants themselves.  To the extent that Dodakian's arguments in favor of misjoinder or severance are applicable to these defendants as well, the Government will address these arguments separately.

[4] The Government intends to proceed to trial on the First Superseding Indictment in the case.  A Second Superseding Indictment naming fewer defendants was prepared for arrest purposes only.

victims were persuaded to invest in defendant Norman's scheme (charged as Count One of the

Indictment), and in defendant Ingram's scheme (charged as Count Two of the Indictment), with

promises that the victims were to obtain 500% returns on investment or greater within a matter of

weeks by paying for legal fees or other expenses incurred by investment accounts or other

investment vehicles located abroad that had been extremely profitable, but that could not be

distributed to investors without payment of the required fees.  (Irwin Aff. ¶ 8).  Specifically,

Norman's program purported to offer investors, inter alia, the opportunity to realize proceeds

from a profitable investment account allegedly held with the World Bank in a foreign country.

Ingram's program purported to offer investors, inter alia, the opportunity to invest in profitable

notes issued by the Federal Reserve abroad.  Investors in both programs were informed that

proceeds from the notes could only be repatriated once fees and expenses incurred by the fund

are paid.  (Irwin Aff. ¶ 9(a)).   Ultimately, none of the victims received the promised returns, and

the perpetrators of both schemes used victims' funds for personal expenses, or to send remaining

funds to co-conspirators.  (Irwin Aff. ¶ 8).

   While the two charged schemes purported to have different investment objectives

and were led by different charged defendants, they were interrelated in several significant ways.

First, defendants Dodakian and Bowen, among others, served as facilitators of both schemes

(Irwin Aff. ¶ 9(b)), and are thus charged in both Counts of the Indictment.  As facilitators they,

among other things, recruited victims; persuaded them to invest funds in one or both of the

fraudulent schemes; provided wiring instructions to victims; gave victims documents prohibiting

victims from disclosing their investments with other, and purporting to guarantee promised

returns from the schemes; and received wired funds directly from victims, forwarding some of

4

the funds to Norman or Ingram, and used other funds for personal expenses.  (Irwin Aff. ¶ 9(b)).

Dodakian and other facilitators also attempted to obtain additional funds from victims by

asserting that the promised returns could not be realized unless additional unexpected expenses

were paid by investors; by inducing victims to invest in additional programs (e.g., by inducing an

investor in Norman's program to invest in Ingram's program), and to lull victims into a false

belief that they would eventually receive the promised returns or, at minimum, return of their

initial investments, when they failed to materialize as promised.  (Irwin Aff. ¶ 9(c)).

   As the Indictment indicates and the Government expects the evidence at trial will

show, Dodakian and Bowen facilitated both schemes, and other defendants explicitly referenced

both schemes, in multiple communications with victims.  These communications included calls

between defendants and victims that were consensually recorded without the defendants'

knowledge by the FBI as part of the instant investigation.  For example, in a call with a victim

that was recorded on December 15, 2006, Ingram informed the victim that the Norman program

was a fraud, and that Bowen had defrauded the victim, but that Ingram would nonetheless honor

Norman's investment contract if the victim invested in his program as well.[5]  This recorded call

is referenced as an overt act in Count Two of the Indictment.  (See Indictment ¶ 6(b)).  In a

consensually recorded call that occurred on March 6, 2007, Bowen assured the same victim that

the victim's funds had been invested in Ingram's program, even though he had earlier been led to

believe that his funds had been invested in Norman's program.[6]  In a consensually recorded call

on May 21, 2007, Dodakian assured a victim who had invested in both Norman's and Ingram's

---

[5] A redacted transcript of the December 15, 2006 call is attached hereto as Exhibit C.

[6] A redacted transcript of the March 6, 2007 call is attached hereto as Exhibit D.

schemes that, while Norman's program was a scam, the Ingram program had been vetted by the

FBI.[7]   As indicated above, several victims invested in, and lost money in, both schemes as a

result of the coordinated efforts of multiple members of the charged conspiracies.

**_____B. The E-mail Search Warrant**

The Irwin Affidavit, which was filed prior to the issuance of the Indictment,

alleged that the Dodakian E-mail Account, Ingram's e-mail account, roberti42@earthlink.net,

and Bowen's e-mail account, Jeanneb129@yahoo.com, among others, contained "evidence,

fruits, and instrumentalities of" violations of the wire fraud statute, 18 U.S.C. § 1343.   (Irwin

Aff. ¶ 1).  The affidavit stated that the computers of the service providers from whom the e-mails

were sought "contain information and other stored electronic communications belonging to

unrelated third parties."  (Irwin Aff. ¶ 3).  Accordingly, the affidavit sought authorization "solely

to search the computer accounts and/or files and following the procedures described herein and

in" the attachments to the requested search warrants.

The body of the Irwin Affidavit set forth facts supporting Special Agent Irwin's

determination that Dodakian, among others, "used e-mail communications to facilitate the

fraudulent schemes" involving Norman and Ingram that were ultimately charged in the

Indictment.  (Irwin Aff. ¶ 14).  The affidavit was based on accounts by several victims of how

they were solicited by Dodakian and others to invest in one or both of the charged schemes, and

the ways in which e-mails from the defendants were instrumental in facilitating the charged

schemes.  The affidavit also included excerpts from e-mails sent from the Dodakian E-mail

Account to victims over a more than 30-month period in which Dodakian promised outlandish

---

[7] A redacted transcript of the May 21, 2007 call is attached hereto as Exhibit E.

returns on investment (prior to investment) or sought to lull victims into believing that they would soon see a return of at least some of the funds which they had invested.  (See Irwin Aff. ¶ 16(b) (July 25, 2005 e-mail from Dodakian E-mail Account promising $7 million combined return on $50,000 investment)), id. ¶ 16(i) (February 26, 2008 e-mail from Dodakian E-mail Account asking for banking information in reference to Ingram's investment program); id. ¶ 17(e) (May 8, 2006 e-mail from Dodakian E-mail Account to victim stating "we cannot return all your principal because that would put you out of the program")).  The affidavit further stated that, on the basis of the recent fraud-related communications occurring over the Dodakian E-mail Account and other e-mail accounts, there was a basis to believe that current records related to the Dodakian E-mail Account, and other e-mail accounts, would contain "evidence of and the means of committing the criminal offenses referred to" in the affidavit, and "would be instrumentalities in" the commission of the charged crimes.  (Irwin Aff. ¶ 25).

The E-mail Search Warrant obtained on the basis of the Irwin Affidavit sought "[a]ll stored electronic mail and other stored content information contained in, or on behalf of," the Dodakian E-mail Account and the other e-mail accounts specifically targeted by the Irwin Affidavit.[8]

### C. The Residence Search Warrant

The Residence Search Warrant was obtained on the basis of the Affidavit of Special Agent Erin Zacher dated August 6, 2008 ("Zacher Affidavit").  By this time, Dodakian had been indicted for her participation in the charged schemes, and the Zacher Affidavit attached

---

[8] E-mail accounts related to another individual who was not charged in the Indictment were also sought pursuant to the Irwin Affidavit and E-mail Search Warrant.

a copy of the Indictment in support of the finding that there was probable cause to believe that

Dodakian had violated federal law.  (Zacher Aff. ¶ 10).  The Zacher Affidavit also marshaled

evidence similar to the evidence set forth above in the discussion of the E-mail Search Warrant

supporting its probable cause determination.

The Zacher Affidavit connected the Dodakian residence to the charged schemes in

the following ways.  First, Special Agent Zacher based the averment that there was probable

cause to believe that the residence contained "evidence, fruits, and instrumentalities of" wire

fraud and wire fraud conspiracy offenses on her substantial experience investigating and

prosecuting white collar crimes, including several years as an Assistant District Attorney,

"training in the investigation and apprehension of fraudulent schemes," and participation "in the

drafting and execution of numerous search warrants."  (Zacher Aff. ¶ 2).  In particular, on the

basis of that training and experience, as well as her conversations with other law enforcement

agents, Special Agent Zacher affirmed that individuals who engage in schemes to defraud

frequently maintain various types of evidence or instrumentalities of the crime at their homes.

(Zacher Aff. ¶ 20).

In addition, the Zacher Affidavit specifically noted that the billing address for the

Dodakian E-mail Account was the Dodakian residence, and that several of the bank records

sought by the Residence Search Warrant were recently mailed to the Dodakian residence.

(Zacher Aff. ¶ 19(c)-(d)).  Finally, the Zacher Affidavit noted Special Agent Zacher's

determination that Dodakian's bank statements reflected that there were "no paychecks or other

regular sources of income deposited into Dodakian's bank accounts, that Dodakian did not list an

office phone number or address or indicate that she had regular employment in communications

with victims of the schemes."  On the basis of this finding, the Zacher Affidavit asserted that

Dodakian used the Dodakian residence, as opposed to a business or other outside location, to

facilitate the charged fraudulent schemes.  (Irwin Aff. ¶ 20).

## II.   EVIDENCE OBTAINED PURSUANT TO THE SEARCH WARRANTS SHOULD NOT BE SUPPRESSED

### A.   Applicable Law

1.   General Principles Applicable to Judicial Review of Search Warrants

"The task of the issuing magistrate is simply to make a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit . . . there is a fair

probability that contraband or evidence of a crime will be found in a particular place."  *Illinois* v.

*Gates,* 462 U.S. 213, 238 (1983).  Similarly, a showing of a sufficient nexus between the alleged

criminal activities and the premises to be searched "does not require direct evidence and 'may be

based on 'reasonable inference' from the facts presented based on common sense and

experience.'" United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (internal citations

omitted).  Probable cause determinations must be approached in a practical way, Gates, 462 U.S.

at 232, because "probable cause is a flexible, common-sense standard."  Texas v. Brown, 460

U.S. 730, 742 (1983).  In sum, the evidence presented to the Magistrate Judge "'must be seen and

weighed not in terms of library analysis by scholars, but as understood by those versed in the

field of law enforcement.'"  Gates, 462 U.S. at 231-32 (quoting *United States* v. *Cortez*, 449 U.S.

411, 418 (1981)); see also United States v. Shipp, 578 F. Supp. 980, 985 (S.D.N.Y. 1984) ("The

standard in reviewing a previous determination of probable cause for the issuance of a search

warrant by a judicial officer is 'only a probability and not a prima facie showing of criminal activity.'" (quoting United States v. Travisano, 724 F.2d 341, 345-46 (2d Cir. 1983)).

The duty of a court reviewing a Magistrate Judge's probable cause determination is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Gates, 462 U.S. at 214.  The information considered by the Magistrate Judge should take into account the "totality of the circumstances" and entail an "assessment of probabilities in particular factual contexts." Id. at 232-33.

Once a "neutral and detached magistrate" issues a search warrant upon a finding of probable cause, that finding is "entitled to substantial deference, and 'doubts should be resolved in favor of upholding the warrant.'" United States v. Rosa, 11 F.3d 315, 326 (2d Cir. 1993) (quoting Travisano, 724 F.2d at 345)).  Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." Travisano, 724 F.2d at 345.

> 2.     The Particularity Requirement of the Fourth Amendment and the All Records Exception

In addition to probable cause, the Fourth Amendment also requires that search warrants "particularly describ[e] the things to be seized." U.S. Const. amend. IV.  The particularity requirement of the Fourth Amendment "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990); see also Andresen v. Maryland, 427 U.S. 463, 480 (1976); Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971) (particularity requirement prevents a "general, exploratory rummaging in a person's belongings").

Thus, although courts have never required precise specification of every item to be seized, see, e.g., United States v. Burke, 718 F. Supp. 1130, 1143 (S.D.N.Y. 1989) (noting that the Second Circuit has approved of "warrants with quite broad language"); United States v. Scharfman, 448 F.2d 1352, 1355 (2d Cir. 1971); United States v. Shakur, 560 F. Supp. 337, 346 (S.D.N.Y. 1983); United States v. Zanche, 541 F. Supp. 207, 210 (W.D.N.Y. 1982), courts do require that a warrant reasonably channel the discretion of those charged with executing it.  See, e.g., Riley, 906 F.2d at 844; United States v. Young, 745 F.2d 733, 759-760 (2d Cir. 1984).  "The warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize."  United States v. George, 975 F.2d 72, 75 (2d Cir. 1992); see also United States v. Liu, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.") (quotations omitted).  A warrant is not sufficiently particularized if it authorizes "the seizure of 'evidence' without mentioning a particular crime or criminal activity to which the evidence must relate."  George, 975 F.2d at 77.

Although some particularity is required, "the Fourth Amendment does not require that every item or document to be seized be specifically identified within the warrant."  United States v. Dinero Express, Inc., No. 99 Cr. 975 (SWK), 2000 WL 254012, *8 (S.D.N.Y. Mar. 6, 2000).  Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgement as to whether a particular document falls within the described category."  Riley, 906 F.2d at 844-45.  "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts

11

which a reasonable investigation could be expected to uncover, and have insured that all those facts were included in the warrant." United States v. Buck, 813 F.2d 588, 590 (2d Cir. 1987).

The fact that a warrant calls "for seizure of a broad array of items does not, in and of itself, prove that the warrant fails to meet this requirement of particularity." United States v. Sugar, 606 F. Supp. 1134, 1151 (S.D.N.Y. 1985). "The validity of a warrant is not affected by the fact that a vast amount of material falls within its scope." Dinero Express, 2000 WL 254012, *8; see also United States v. Heldt, 668 F.2d 1228, 1254 (D.C. Cir. 1982); Zanche, 541 F. Supp. at 210 ("the fact that an exceedingly large number of documents were encompassed by the list does not invalidate the warrant"). Similarly, "where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized." United States v. Gotti, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999) (citing United States v. Regan, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989 ) ("The degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity investigated.")).

Lending further flexibility to the particularity requirement, the Second Circuit has expressly held that where "there was probable cause to believe that [a] business was permeated with fraud . . . the agents could properly seize all of the business records." National City Trading Corp. v. United States, 635 F.2d 1020, 1026 (2d Cir. 1980); accord United States Postal Serv. v. CEC Servs., 869 F.2d 184, 187 (2d Cir. 1989) ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements"); United States v. Johnson, 886 F. Supp. 1057, 1072-73 (W.D.N.Y. 1995) (holding that where "the businesses were the vehicle by which the Defendants are alleged to have perpetrated the fraud . . . [and] [i]t appears that the sole business of these related companies was waste transport, storage and disposal, . . . the allegations

12

of illegal conduct permeate all aspects of the Defendants' businesses.  As such, the warrant authorizing a seizure of all business records and documents relating to their business operations, was not unconstitutionally overbroad.").  "In order to fall within the 'all records' exception, it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud.  Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.'" Burke, 718 F. Supp. at 1139-40 (quoting United States v. Offices Known as 50 State Distributing Co., 708 F.2d 1371, 1372-75 (9th Cir. 1983) (quoting United States v. Brien, 617 F.2d 299, 308 (1st Cir. 1980)).

The "all records" exception has been applied where the relevant affidavit established widespread misconduct.  See, e.g., United States v. Oloyede, 982 F.2d 133, 140 (4th Cir.1992) ("[Affidavit presented d]ocumentation in over 50 cases . . . , two confidential informants outlined in great detail the procedures associated with appellants' operation, and a review of 26 files disclosed that each file contained fraudulent documents.") (emphasis added); Nat'l City Trading Corp., 635 F.2d at 1021-22 (affidavit listed forty complaints about the enterprise, twenty of which had been investigated, and a pattern of conduct was identified by the investigator); Brien, 617 F.2d at 309 (warrant application listed 250 complaints about the enterprise and the affiant interviewed twenty former employees).

3.      Issues Particular to Searches of Evidence Held by Third Party Electronic Communications Service Providers

_____While the above principles are applicable to both the E-mail Search Warrant and the Residence Search Warrant, the E-mail Search Warrant raises two unique constitutional and practical issues.  First, the evidence sought by the E-mail Search Warrant was voluntarily stored by Dodakian on a third-party electronic communications service provider's computer server (Comcast's server, in Dodakian's case) at the time of search, and could not be obtained directly by the FBI from Dodakian or a source other than the third-party service provider.  Second, searches of content held by third-party service providers are highly regulated by statute, and may be permitted on the basis of less than probable cause, pursuant to 18 U.S.C. § 2703(d).

_____         a.    Applicable Law Governing Compelled Production of Evidence
                             Held By Third Parties

_____         A series of Supreme Court decisions authorized third party disclosure of evidence upon Government request pursuant to a subpoena or other lawful process short of a search warrant based on probable cause.   In United States v. Miller, 425 U.S. 435 (1976), the Court rejected a defendant's argument that his Fourth Amendment rights were violated when the Government obtained by subpoena banking information that he asserted was private, stating that "[t]his Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." Id. at 443; see also Hoffa v. United States, 385 U.S. 293, 302 (1966) (holding that no Fourth Amendment rights were violated by informant's disclosure of contents of conversation in hotel room on grounds that defendant "was not relying on the security of the hotel room; he was relying upon his misplaced confidence that [the informant] would not reveal his wrongdoing").

14

In <u>SEC v. Jerry T. O'Brien, Inc.</u>, 467 U.S. 735 (1984), the Supreme Court unanimously reversed an appellate decision that had required the SEC to notify targets of an SEC investigation when it sent subpoenas to third parties seeking records concerning the targets.  <u>See</u> <u>id.</u> at 740.  Relying in part on <u>Miller</u>, the Court held that the targets of the investigation could not "invoke the Fourth Amendment in support of" a rule requiring notice when a third-party subpoena seeking records related to the targets issued because, "when a person communicates information to a third party *even on the understanding that the communication is confidential,* he cannot object if the third party conveys that information or records thereof to law enforcement authorities."  <u>Id.</u> at 743 (emphasis added) (citing <u>Miller</u>, 425 U.S. at 443).  According to the Court, <u>Miller</u> and related cases "disable [the targets] from arguing that notice of subpoenas issued to third parties is necessary to allow a target to prevent an unconstitutional search or seizure of his papers."  <u>Id.</u>; <u>see</u> <u>United States v. Daccarett</u>, 6 F.3d 37, 50 (2d Cir. 1993) (stating that in <u>O'Brien</u>, the Court held "that a 'target' of an investigation has no right to notice of subpoenas issued to third parties"); <u>see also</u> <u>Couch v. United States</u>, 409 U.S. 322, 335-36 (1973) (finding no Fourth Amendment bar to obtaining defendant's personal financial records left with her accountant through subpoena to accountant).

The Court also rejected the targets' arguments that permitting the SEC to issue subpoenas to third-party recordholders without notifying them violated the Fifth Amendment's Due Process Clause or the Sixth Amendment's Confrontation Clause.  <u>See id.</u> at 742 ("[N]either the Due Process Clause of the Fifth Amendment nor the Confrontation Clause of the Sixth Amendment is offended when a federal administrative agency, without notifying a person under investigation, uses its subpoena power to gather evidence adverse to him. The Due Process Clause is not implicated under such circumstances because an administrative investigation

15

adjudicates no legal rights, and the Confrontation Clause does not come into play until the

initiation of criminal proceedings.") (internal citations omitted).  Nor, according to the Court, can

a target who is not notified of subpoenas relating to the target served on third parties

> seek shelter in the Self-Incrimination Clause of the Fifth Amendment.  The
> rationale of this doctrine is that the Constitution proscribes only compelled
> self-incrimination, and, whatever may be the pressures exerted upon the person to
> whom a subpoena is directed, the subpoena surely does not "compel" anyone else
> to be a witness against himself.  If the "target" of an investigation by the SEC has
> no Fifth Amendment right to challenge enforcement of a subpoena directed at a
> third party, he clearly can assert no derivative right to notice when the
> Commission issues such a subpoena.

Id. at 742-43 (internal footnote and citations omitted).

b.      E-mail Searches Are Highly-Regulated by Statute

In part because the law related to disclosure of records held by third parties is

more flexible than the Fourth Amendment's warrant requirement, disclosure of certain categories

of e-mails are permitted on less than probable cause.  Title 18, United States Code, Section

2703(a) provides the highest level of protection to electronic materials, including e-mails that are

in transit or emails less than 180 days old that have not yet been read by their intended recipients

without a search warrant based on probable cause, reflecting the close analogy between e-mail

traffic and traffic of mail or telephone communications, which the Supreme Court has held

cannot be disclosed without a warrant, see Berger v. New York, 388 U.S. 41 (1967) (holding that

no wiretapping of telephone conversations is permitted except pursuant to warrant based on

probable cause); Katz v. United States, 389 U.S. 347 (1967) (applying warrant requirement to

eavesdropping on telephone conversation in telephone booth); United States v. Van Leeuwen,

397 U.S. 249, 251 (1970) ("It has long been held that first-class mail such as letters and sealed

packages subject to letter postage . . . is free from inspection by postal authorities, except [with a warrant].").

              However, e-mails that have been opened by their intended recipients or unopened e-mails that have are older than 180 days may be obtained, not only on the basis of a warrant, <u>see</u> 18 U.S.C. § 2703(b)(1)(A), but also on the basis of a subpoena or court order pursuant to Section 2703(d), <u>see id.</u> § 2703(b)(1)(B).  The lesser protections accorded to e-mail of this type reflect the close analogy between service providers in this role and other third parties that are entrusted with information but that are nonetheless compelled to disclose that information in response to a subpoena or other compulsory process—for example, the targets of the investigation in <u>O'Brien</u> and <u>Couch</u>. <u>See</u> Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev.  1208, 1234 (2004) (noting that "[t]he apparent thinking behind the lower thresholds for government access of both permanently stored files and unretrieved files stored for more than 180 days is that the lower thresholds track Supreme Court precedents interpreting the Fourth Amendment").  Section 2703 tracks the relevant Supreme Court precedents because a subscriber voluntarily leaves e-mails with a service provider once they are received and read.  Instead of doing so, the subscriber could, for example, delete e-mails once they are read or store them on a computer and/or backup facility maintained by the subscriber and located within the subscriber's home.  By voluntarily choosing to store opened e-mails with third party service provider, a subscriber assumes the risk that the third party will disclose the content of those communications under <u>O'Brien</u> and related cases.

―――――

c.     The Government Cannot Delegate Searches to Private Parties

Moreover, the evidence sought by a search warrant for e-mail accounts held by third party service providers must be obtained and searched through means different than other search warrants involving premises or other searches of property in two respects.  First, the FBI or other law enforcement agency does not itself obtain the accounts to be seized and searched from the service provider.  Rather, the investigative agency relies on the third party service provider to provide the FBI with records that are responsive to the warrant.  Second, the investigative agency cannot rely on the third party service provider to determine which, if any, of the electronic communications stored on the third party service provider's servers is responsive to the warrant; such a result would improperly, and likely unconstitutionally, delegate the responsibility for execution of the warrant to private third party service providers.  See, e.g., Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir. 1995) (holding that there was "no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant"); Willits v. Wal-Mart Stores, Inc., 2001 WL 1028482, 12, No. IP99-0276-C-M/S (S.D. Ind. Aug. 14, 2001) (finding it "clearly established" that law enforcement officers acted unconstitutionally in  "delegating to private parties the absolute right to control and execute a search warrant"); see also 18 U.S.C. § 3105 ("A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.").  Thus, in the case of e-mail search warrants directed at private third party service providers, the Government must obtain the entire copy ofof

the seized records maintained by the third party to prevent a private search from occurring, and to ensure the integrity of the search process.

4.      The Good Faith Exception

Even a finding that a search warrant was invalid does not end the inquiry.  The Supreme Court has held that the exclusionary rule and its harsh remedy of suppression should not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." United States v. Leon, 468 U.S. 897, 922 (1984).  "The essential rationale underlying [this] good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'" United States v. Cancelmo, 64 F.3d 804, 807 (2d Cir. 1995) (quoting Leon, 468 U.S. at 919); see also Arizona v. Evans, 514 U.S. 1, 10 (1995) (use of exclusionary rule is not warranted where it does not result in deterrence).  Therefore, the pivotal question to be asked in each case is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 922 n.23; see also United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992).  If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression should not be ordered.  See, e.g., United States v. Roberts, 852 F.2d 671, 675 (2d Cir. 1988).  It is the Government's burden to demonstrate the objective reasonableness of the officers' good faith reliance.  George, 975 F.2d at 77.

The only instances where the good faith exception will not apply are where: (1) the magistrate was misled by information that the affiant knew was false; (2) the magistrate wholly abandoned his or her judicial role; (3) the supporting affidavit was "so lacking in indicia

19

of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid."  Leon, 468 U.S. at 923.

In evaluating whether reliance on the warrant was reasonable, courts have looked to see whether the warrant affidavit was "a bare bones affidavit" or whether it contained "many objective facts."  See United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992); United States v. Burke, 718 F. Supp. at 1142.  Holding that the officers reasonably relied on the warrant at issue in Moore, the Second Circuit noted the great deference that should be accorded a magistrate's determination concerning probable cause:

> As the Supreme Court has noted, "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination."  Nor are there mechanical criteria for assessing the amount of information necessary for a probable cause finding:  "In dealing with probable cause . . . as the very name implies, we deal with probabilities.  These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

Moore, 968 F.3d at 222-23 (citations omitted).

Courts have likewise placed considerable weight on the fact that prosecutors were consulted in the warrant application process.  See, e.g., United States v. Singh, 390 F.3d 168, 183 (2d Cir. 2004) (where affidavit contained detailed information of criminal activity and agent "had been told by an Assistant United States Attorney that he agreed the information revealed in the affidavit established probable cause for the search . . . it was objectively reasonable for the Special Agent to believe that probable cause for the warrant was stated and for her and the other agents to rely in good faith on the warrant as issued by the Magistrates."); United States v.

Koerth, 312 F.3d 862, 868 (7th Cir. 2002) ("An officer's decision to obtain a warrant is prima

facie evidence that he or she was acting in good faith.") (citing Leon, 468 U.S. at 921 n. 21);

United States v. Herbin, No. Cr. 204-93, 2005 WL 2789047, * 3 (D. Vt. Oct. 26, 2005)

("Approval of the affidavit by an Assistant United States Attorney is relevant as part of the

totality of the circumstances analysis of the good faith exception."); Burke, 718 F. Supp. at 1141

(finding good faith reliance where, among other things, "warrants were approved by no fewer

than three federal court magistrates and an Assistant United States Attorney").

            B.      Dodakian's Challenge to the E-mail Search Warrant Should Be Denied

Dodakian moves to suppress e-mail correspondence seized pursuant to the E-mail

Search Warrant.  She argues in her motion that the Search Warrant was overbroad, lacked

particularity, and amounted to a "general warrant" in violation of the Fourth Amendment because

it sought all of the electronic correspondence located in her e-mail account.[9]  As discussed more

fully below, the Search Warrant was not overbroad.  Rather, it targeted a particular set of items

related to a specific crime.  Second, the defendant's reliance on United States v. Cioffi, No. 08-

CR-415 (FB), 2009 WL 3738314 (E.D.N.Y. Nov. 2, 2009), which this Court is not obliged to

follow, is misplaced because: (1) the court in Cioffi reached the wrong conclusion based on an

incomplete analysis of the legal and practical considerations bearing on e-mail search warrants;

and (2) the facts and circumstances in Cioffi are different from those present here.  Third, even if

this Court were to determine that the Search Warrant lacked particularity, the defendant's e-mail

account was so pervaded by correspondence containing instrumentalities and evidence of the

alleged fraud that the "all records exception" applies.  Lastly, should the Court find that a Fourth

---

[9] Dodakian does not challenge Magistrate Judge Dolinger's conclusion that the search warrant for the Dodakian E-mail Account was supported by probable cause.

Amendment violation occurred, the agents acted in good faith when executing the warrant, and as such, the good faith exception applies.

1.      The Search Warrant Did Not Violate the Fourth Amendment's Particularity Requirement

Dodakian asserts that the E-mail Search Warrant was unconstitutionally overbroad because it "made no attempt to specify the e-mail, or even categories of e-mail which were to be seized.  Instead, it authorized the wholesale seizure of all e-mail in the account."  (Dodakian Mem. of Law 2).  On the basis of this observation, Dodakian likens the E-mail Search Warrant to the warrant in Groh v. Ramirez, 540 U.S. 1284 (2004), which invalidated a warrant to search a residence that "did not include describe the items to be seized at all," id. at 558, and to "general" warrants authorizing searches for, in addition to items specified in the warrant, "any other evidence relating to the commission of a crime."  United States v. George, 975 F.2d 72, 75 (2d Cir. 1992).  Dodakian draws upon Judge Block's recent decision in Cioffi, which invalidated an e-mail search warrant on the basis of a finding that it was overly general because "[t]here was no provision limiting the emails to be seized to those containing evidence of the crimes charged in the indictment or, indeed, of any crime at all."  2009 WL 3738414, at *2.  (Dodakian Mem. of Law 3-5).

This argument fails to take into account several important considerations.  First, the E-mail Search Warrant did not seek to seize all of Dodakian's e-mails, or even all e-mails held by Comcast related to Dodakian.  Rather, the Search Warrant sought to seize only e-mails from one service provider, related to one specific e-mail account, that federal agents had identified as having been used by the defendant to send and receive e-mails that perpetuated the fraudulent schemes alleged in the Indictment.

Near-identical language to that used in the E-mail Search Warrant has previously been considered, and upheld, by Judge Paul A. Crotty of this district, a determination that was deemed sufficiently uncontroversial by the Second Circuit that it was affirmed by summary order.  In United States v. McDarrah, No. 05 Cr. 1182 (PAC), 2006 WL 1997638, (S.D.N.Y., July 17, 2006), the Court found that a search warrant that was essentially identical to the E-mail Search Warrant, in that it sought, among other items, "[a]ll stored electronic mail and other stored content information presently contained in, or on behalf of, the following electronic mail addresses and/or individual accounts: Ps41alum@aol.com," was supported by probable cause to believe that "Defendant used his AOL account as one of the means by which he was violating [the law]."  Id. at *9.  Addressing the defendant's challenge to the language as overbroad, the Court held that "[e]ven if there may be unanswered questions as to the "applicability of the Fourth Amendment's particularity requirement with respect to searches of computer data, given the circumstances in this case, there was clearly probable cause to search the AOL e-mail account and the warrant was not overbroad."  Id.  The Second Circuit upheld the District Court's findings, concluding that "the warrant was sufficiently particular to enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize."  United States v. McDarrah, No. 07-1849-cr, 2009 WL 3645400 (2d Cir. 2009) (citing United States v. George, 975 F.2d 72, 75 (2d Cir. 1992)).  The Second Circuit further found that the warrant in McDarrah "described the items subject to search with particularized detail and did not include a catch-all provision providing for the search of "any other evidence" or allow for wide-ranging searches beyond what was described."  Id. at *2.[10]

---

[10]  A copy of the E-mail search warrant issued and upheld in McDarrah is attached hereto as Exhibit F.

Moreover, like the search warrant in <u>McDarrah</u>, the Search Warrant in the instant case was also supported by an affidavit by a law enforcement agent, here the Affidavit of Special Agent Kevin Irwin of the Federal Bureau of Investigation ("Affidavit").  Special Agent Irwin's Affidavit described in detail the scheme and the investigation, <u>see</u> Affidavit, 9-15, outlined specific instances where the target e-mail accounts, including the e-mail account in question here, were used in furtherance of the scheme, <u>see</u> <u>id.</u>, 15-27, and listed, with particularity, the items, including the fruits, instrumentalities and evidence, that were likely to be found in the target e-mail accounts.  <u>See</u> <u>id.</u>, 27-29.  The face of the Search Warrant itself, which was signed by Magistrate Judge Dolinger after reviewing the Affidavit, acknowledges that Judge Dolinger was "satisfied that there is probable cause to believe that the property so described is being concealed on the premises above-described" and noted that the "grounds for issuance of the search warrant exist as stated in the supporting affidavit."  Similar to <u>McDarrah</u>, therefore, this Court should find that the Search Warrant was sufficiently particular and specific, and not fatally "general" in nature that it runs afoul of the Fourth Amendment.  <u>See</u> <u>McDarrah</u>, 2009 WL 3645400, at *2 (noting that the agent's affidavit in support of the search warrant provided the magistrate judge with "ample evidence that a crime was committed and strong indication that further evidence of criminal activity could be found in e-mails between McDarrah" and others permitted the Magistrate Judge a "substantial basis" from which to conclude that a search of the messages in the account would "uncover evidence of wrongdoing") (internal quotations and citations omitted).

       2.     <u>Cioffi Should Not Be Followed By This Court and Nevertheless Does Not Apply</u>

Despite the Search Warrant's sufficient particularity, the defendant nevertheless argues that this Court should follow an Eastern District of New York judge's ruling in <u>Cioffi</u> and invalidate the warrant.  In <u>Cioffi</u>, the district court found that a search warrant that permitted the seizure of all e-mails from a particular e-mail account was a "general warrant" in violation of the Fourth Amendment.  In reaching that conclusion, the court found that the face of the search warrant failed to specify what items were to be seized from the e-mail account, instead seeking the seizure of all e-mails from that account.[11]  The court held that "[t]here was no provision limiting the e-mails to be seized to those containing evidence of the crimes charged in the indictment or, indeed, of any crime at all."  <u>Id.</u> at *2.  The search warrant in <u>Cioffi</u>, like the Search Warrant here, was accompanied by an affidavit from the law enforcement agent detailing the investigation and the probable cause supporting the search.  The court found, however, that because the affidavit was neither attached to the search warrant itself, nor incorporated by reference into the warrant, the Government's reliance on the affidavit did not save the lack of particularity in the warrant.  The Court cited the Second Circuit's decision in <u>United States v. George</u>, 975 F.2d 72, 76 (2d Cir. 1992) for the proposition that "[a] sufficiently specific affidavit will not itself cure an overbroad warrant."  In addition, the court discussed the Second Circuit's decision in <u>United States v. Bianco</u>, 998 F.2d 1112 (2d Cir. 1993) which, contrary to <u>George</u>, eschewed the "formal requirements of incorporation and attachment" in favor of a "commonsense" approach because "the functional purposes of those two requirements – to insure

---

[11] The warrant at issue in <u>Cioffi</u> authorized law enforcement to seize from the defendant's e-mail account the items set forth in Attachment A to the Warrant.  The attachment listed seven categories of "records and other stored information" relating to the defendant's account.  The relevant category was described as "all e-mail up through August 12, 2007, including any attachments, and all instant message, sent by or received by the accounts [sic], whether save or deleted, whether contained directly in the e-mail account or in a customized folder."  <u>Cioffi</u>, *2.

that all parties involved are informed of the scope of and limits upon the authorized search –

were fully satisfied." Id. at 1117.  The Cioffi court opined, however, that Bianco "can no longer

be viewed as the law of the Second Circuit in light of the Supreme Court's subsequent decision

in Groh v. Ramirez," 540 U.S. 551, (2004) and could therefore no longer be considered good

law.[12]

      This Court should not follow the district court's opinion in Cioffi, which did not

even cite, much less address, Judge Crotty's and the Second Circuit's opinions in McDarrah.

First, the cases on which Cioffi relies are factually distinguishable.  The search warrant found

invalid in George gave law enforcement "broad authorization to search for 'any other evidence

relating to the commission of a crime.'"  George, 975 F.2d at 75 (citation omitted).  In George,

the Second Circuit noted that the lack of particularity in the warrant "effectively granted the

executing officers' 'virtually unfettered discretion to seize anything they [saw].'"  Id. (internal

citations omitted).  The search warrant in Groh was similarly overbroad, seeking to seize "a

single dwelling residence … blue in color," without specifying the items within the residence that

might be subject to search and seizure.   As described above, the Search Warrant at issue here

specifically sought only the electronic mail and stored content associated with a single e-mail

---

[12] In Groh, the Supreme Court decided, in the context of a Bivens action, that the search warrant in question was invalid because it lacked particularity in describing the items to be seized.  The search warrant in Groh stated that the items to be seized consisted of a "single dwelling residence … blue in color."  The defendant conceded, and the Court held, that the warrant did not describe the items to be seized at all and that the search warrant was facially invalid.  The defendant, however, argued that the attached affidavit provided particularity to the search warrant.  Giving credence to the argument, the Court recognized that "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant," but nevertheless found that since the affidavit at issue had not been attached nor formally incorporated by reference, the Court need not "further explore the matter of incorporation."  Id. at 558.

account; it did not, for example, permit agents to demand content from Comcast, nor from any other service provider, related to other e-mail accounts held by Dodakian or other co-conspirators if an initial search of the "prosper40@comcast.net" revealed the existence of additional accounts that were used by Dodakian or others to perpetrate the fraud.  On its face, therefore, the E-mail Search Warrant at issue possessed the particularity missing from the search warrants that were rejected by the courts in <u>George</u> and in <u>Groh</u>.

   Moreover, <u>Cioffi</u> and Dodakian make an unwarranted analogy between a search warrant seeking all e-mails in a specific account, which is limited as described above, and a general warrant authorizing seizure of anything and everything contained within a residence or other physical premises.  A warrant authorizing the search of a residence, for example, may permit the seizure of all documents or items of a certain type within the residence when there is probable cause to believe that those items may contain evidence, fruits, or instrumentalities of crime, without becoming overly general.  For example, the Residence Search Warrant authorizes the search and seizure of all "[a]ddress books, organizers, cell phones, and personal digital assistants" that might be found within Dodakian's residence.  (Residence Search Warrant ¶ 4). For the reasons stated in the Zacher Affidavit, there was probable cause to believe such items would contain evidence of Dodakian's criminal activities; thus, there was a basis to seize these and other items listed in the Residence Search Warrant.  Dodakian properly does not allege that the request for these items, without limitation, in the Residence Search Warrant renders that warrant overbroad.  Yet Dodakian and <u>Cioffi</u> seem to suggest that, if the subject of the warrant is a single "object" containing electronic evidence (<u>e.g.</u>, a cellphone, a personal digital assistant, or an e-mail account), that warrant is overbroad unless it restricts searches and seizures to certain specified items within that single object.  Were this the case, a search of the entire contents of a

cellphone would be permissible if the cellphone is seized pursuant to a residential search warrant authorizing searches of multiple categories of items, but not if the cellphone is seized independently and searched pursuant to its own warrant purporting to authorize the search of the entire cellphone. The test of whether a warrant is overbroad cannot depend solely on an artificial definition of how the items potentially to be searched and seized may be defined.

Third, in relying on <u>George</u> and <u>Groh</u>, the <u>Cioffi</u> court failed to recognize that the search warrants in those cases involved the searches of homes, not of electronic mail accounts, which are governed by Section 2703. Section 2703 creates a code of criminal procedure that federal and state law enforcement officers must follow to compel disclosure of stored communications from network service providers. Following Section 2703, which was enacted with the public's privacy interests in mind, law enforcement personnel followed the following procedure: first, they submitted a search warrant directing the service provider to produce all e-mail from within the specified account or accounts; and second, pursuant to the search warrant, law enforcement reviewed the information produced and identified and copied information that fells within the scope of the particularized "items likely to be found" discussed in the Affidavit. In sum, Section 2703(a) contemplates the procedure by which service providers are directed to collect and copy <u>all</u> the communications from a specific e-mail account which is to be later reviewed by authorized federal agents.[13] This procedure was outlined in the Affidavit of Special

---

[13] Indeed, the proposed amendment to Rule 41 explicitly sets forth the process to be followed by law enforcement. Specifically, Rule 41(e)(2)(B) provides that after a warrant under Rule 41 (e)(2)(A), "authoriz[ing] the seizure of electronic storage media or the seizure or copying of electronically stored information" is issued, and "unless otherwise specified," the warrant "authorizes a *later* review of the media or information consistent with the warrant." (emphasis added).

Agent Irwin.  Any other procedure would effectively and improperly deputize the e-mail service provider as a government agent by asking it to actively participate in the fact gathering and analysis process.[14]

It is this process that makes search warrants seeking electronic e-mail different from the search warrants authorizing the searches of homes, a critical difference neglected by the Cioffi court.  This difference, however, is not novel to the judicial branch.  "[I]t is frequently the case with computers that the normal sequence of 'search' and then selective 'seizure' is turned on its head, as computer hardware is seized from a suspect's premises before its content is known and then searched at a later time." United States v. Vilar, No.S3 05CR621 (KMK), 2007 WL 1075041 (S.D.N.Y. April 4, 2007).  Further, the seizure of all e-mails before review is not only permitted under the law, it is necessary given the tools of the electronic age criminal.  "Nefarious documents can be given innocuous names, or can be manipulated, hidden or deleted with great ease." Id. at *36 (citation omitted).  Despite these differences and "although searches of computers present unique constitutional challenges, the ultimate Fourth Amendment standard is the same for both computer and hard-copy search: reasonableness." Vilar, 2007 WL 1075041at *36.  The Search Warrant in the instant case, the supporting Affidavit, and the process followed by law enforcement personnel after the e-mails were seized were all reasonable and supported by the law.

In any event, the E-mail Search Warrant in this case is factually distinguishable from Cioffi.  In Cioffi, Judge Block considered whether an e-mail account used by a defendant

---

[14] Indeed, the e-mails seized by law enforcement agents pursuant to the Search Warrant were previously preserved by the e-mail service provider pursuant to a request by the agents under Title 18, United States Code, Section 2703(f)(1).  Pursuant to that request, the service provider took a "snapshot" of an e-mail account and saved that information for later retrieval pursuant to a search warrant.  See Affidavit, ¶ 24.

for personal communications could be subject to search. Even if it were appropriate to restrict searches of email accounts that are known to be personal in nature and that have only limited evidentiary value, it would not be appropriate to demand such particularity when the proof, as here, indicates that the Dodakian Email Account was an instrumentality of the charged fraud, and was likely to contain extensive evidence of fraud.

        3.      <u>The All Records Exception Applies</u>

        Even if this Court were to find that the Search Warrant lacked particularity, the "all-records" exception applies. The Affidavit clearly sets forth the pervasiveness of the defendant's use of her e-mail account in perpetuating her fraudulent scheme. The Affidavit attests, for example, that the defendants "used e-mail communications to facilitate the fraudulent schemes described [in the Affidavit]." Affidavit, ¶ 14. The Affidavit then set forth numerous examples of instances where victims received e-mail communications from one or more of the defendants from their e-mail accounts in furtherance of the fraudulent scheme. Affidavit, ¶¶ 15-21. The defendant's consistent use of her e-mail in communicating with both victims, and co-conspirators supports a finding that the agents had probable cause to seize all of the electronic correspondence located in her e-mail account. See <u>National City Trading Corp. v. United States</u>, 635 F.2d at 1026; <u>United States Postal Serv. v. CEC Servs.</u>, 869 F.2d at 187. The more than 30-month duration of e-mails sent by Dodakian to perpetrate the fraud provides further evidence that Dodakian Email Account was likely to be rife with fraud. It is clear, from the small sampling of e-mails that were highlighted in the Affidavit (which were gathered from the e-mails of various victims) that there was "widespread misconduct" contained in the defendant's e-mail account. This Court, therefore, should find that the 'all records' exception applies.

B.    There Was Probable Cause to Search the Residence

Dodakian claims that the Zacher Affidavit relied purely on a combination of "agent 'expertise' and guess work," and thus did not sufficiently demonstrate probable cause to believe that Dodakian's residence would contain evidence of crime.[15]   This argument is very similar to the argument made by Ingram in his prior motion to the Court.

This claim is groundless.  Significantly, the Zacher Affidavit stated specific facts supporting the conclusion that Dodakian's residence contained evidence of fraud.  First, as set forth above, Dodakian had bank statements and other records related to the fraud mailed to her residential address.  Moreover, Dodakian did not appear to receive a salary or work at a business, and yet she was purporting to generate documents and other correspondence related to financial transactions with multiple investors.  It was entirely reasonable for Special Agent Zacher, and later United States District Judge Mark R. Kravitz, who approved the warrant, to conclude that there was a "fair probability" that Dodakian's residence would obtain evidence, fruits or instrumentalities of the crimes that she had been charged with committing.  See Gates, 462 U.S. at 238 (requiring a showing of "fair probability" to support a finding of probable cause).

Finally, in addition to the independent facts set forth in the Zacher Affidavit, "an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application."  United States v. Fama, 758 F.2d at 838 (upholding consideration of law enforcement officer's expert opinion that "major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other documents evidencing their criminal activities"); Singh, 390 F.3d at 182 (noting, in a fraud case, that "an experienced case

_____

[15] In fact, Dodakian's residence did contain extensive evidence of Dodakian's involvement in the charged schemes when it was searched.

31

agent[] opined not only that the materials sought were of the type that would be kept over a

period of years but that they could reasonably be found in a residence").  As in Singh, in this

case, Special Agent Zacher opined that Dodakian would maintain records related to the fraud,

and would be likely to maintain them in her home, based on several years of experience

investigating white collar crimes that the evidence sought was likely to be maintained at

Dodakian's residence and/or within a computer located at the residence.  Special Agent Zacher's

opinion is another factor on which Magistrate Judge Dolinger could rely in finding that the

Zacher Affidavit demonstrated probable cause.

       For these reasons, as well as the reasons stated in the Government's opposition to

Ingram's pretrial motion making this same challenge, Dodakian's challenge to the Residence

Search Warrant should be denied.

### III.   The Evidence Is Admissible In Any Event Because The Search Warrants Were Executed in Good Faith

       Even if the Search Warrants did not demonstrate probable cause to search

Dodakian's residence, or sufficient particularity to justify searching Dodakian's e-mail account

(which, as set forth above, they did), the evidence is still admissible under the well-settled law of

this Circuit because the Search Warrants were clearly executed in good faith.

       Even in instances where evidence is seized pursuant to a warrant for which

probable cause was lacking, the evidence nevertheless is admissible upon a showing that the

officers who executed the warrant did so in "objective good faith."  United States v. Leon, 468

U.S. 897, 923 (1984).  Here, there is absolutely no evidence, and the defendant does not even

contend, that Magistrate Judge Dolinger or Judge Kravitz was misled or wholly abandoned his

judicial role in determining that the Search Warrants established probable cause and were sufficiently particular.

   With respect to the Residence Search Warrant, Judge Kravitz's finding of probable cause to search the Residence supports an objectively reasonable belief that probable cause existed.  See, e.g., Fama, 758 F.2d at 837; United States v. Falso, 544 F.3d 110, 128 (2d Cir. 2007) (noting that it is "very difficult" to show that an application is so lacking in indicia of probable cause as to render reliance upon it unreasonable, and stating that  "[o]nce the district court ruled on the legal sufficiency of the facts alleged in the affidavit, the officers were justified in executing the warrant") (citations omitted).  In addition, such an objectively reasonable belief is supported by Special Agent Zacher's expert opinion that there was probable cause to believe that the Residence contained evidence, fruits and instrumentalities of wire fraud and conspiracy to commit wire fraud.  Fama, 758 F.2d at 838 (stating that "an agent's expert opinion . . . should also be considered as a factor contributing to objective good faith.").  Finally, given the extensive investigation set forth in the Zacher Affidavit, including the collection and review of financial, public and utility records and victim and co-conspirator correspondence, the conducting of interviews of many victims, the identification of what is estimated to be over $10 million in loss to over 100 victims, it cannot be said that the Zacher Affidavit was so lacking in probable cause as to make reliance upon it unreasonable.  See United States v. Rios, 881 F. Supp. 772, 777-78 (D. Conn.1995) (finding evidence admissible under good-faith exception where "[t]he affidavit related the results of an extensive investigation and . . . provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause").

   These factors are equally applicable to the E-mail Search Warrant.  Even if the Court determines that, in the future, warrants of the type that authorized the search of the

Dodakian Email Account will not be approved, the agents obtained and executed the E-mail

Search Warrant in good faith soon after the McDarrah decision was issued, and before Cioffi was

decided.

III.     **The Defendant's Motions for Misjoinder and Severance Should Be Denied**

     A.     <u>Applicable Law</u>

     The Supreme Court has made plain that there is a "preference in the federal

system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S.

534, 537 (1993); <u>see</u> Fed. R. Crim. P. 8(b). This preference reflects a settled precept in criminal

law:

> Joint trials "play a vital role in the criminal justice system."
> Richardson v. Marsh, 481 U.S. 200, 209 (1987). They promote
> efficiency and "serve the interests of justice by avoiding the scandal
> and inequity of inconsistent verdicts." Id. at 210.

Zafiro, 506 U.S. at 537. Joint trials of defendants indicted together also serve to "conserve

prosecutorial resources, diminish inconvenience to witnesses, and avoid delays in the

administration of criminal justice." Richardson v. Marsh, 481 U.S. 200, 217 (1987) (Stevens, J.,

dissenting). The Richardson Court explained:

> It would impair both the efficiency and the fairness of the criminal
> justice system to require . . . that prosecutors bring separate
> proceedings, presenting the same evidence again and again, requiring
> victims and witnesses to repeat the inconvenience (and sometimes
> trauma) of testifying, and randomly favoring the last-tried defendants
> who have the advantage of knowing the prosecution's case
> beforehand. Joint trials generally serve the interests of justice by
> avoiding inconsistent verdicts and enabling more accurate assessment
> of relative culpability — advantages which sometimes operate to the
> defendant's benefit. Even apart from these tactical considerations,
> joint trials generally serve the interests of justice by avoiding the
> scandal and inequity of inconsistent verdicts.

Id. at 210 (footnote omitted).  Thus, even where joint trials invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits."  United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).

Rule 14 of the Federal Rules of Criminal Procedure permits severance in certain limited circumstances.[16]  However, the presumption in favor of joint trials is so strong that the Second Circuit has stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial."  United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).  A defendant seeking severance therefore shoulders the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial.  United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (internal quotation marks omitted).  It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]."  Zafiro, 506 U.S. at 540.  Instead, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Id. at 539; see also United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").

---

[16]  Rule 14 provides in pertinent part:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a).

Such instances include, for example, when evidence of wrongdoing was admissible only against one of the defendants; where defendants at a joint trial have markedly different levels of culpability; or where a co-defendant's statement technically admissible only against a co-defendant was also probative of the defendant's guilt. Zafiro, 506 U.S. at 539. Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. at 539 (citing Richardson, 481 U.S. at 211); see also United States v. Freyer, 333 F.3d 110, 114 (2d Cir. 2003).

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998); see also Freyer, 333 F.3d at 114 (holding that joinder of defendants is "proper when the alleged acts are 'unified by some substantial identity of facts or participants and a common plan.'" (quoting United States v. Attenasio, 870 F.2d 809, 815 (2d Cir. 1989))); United States v. Bin Laden, 109 F. Supp. 2d 211, 214 (S.D.N.Y. 2000) ("When more than one defendant is accused of participating in the same act or transaction or series of acts or transactions, federal law expresses a strong preference for a single, joint trial of all defendants." (footnote omitted)), aff'd, 552 F.3d 93 (2d Cir. 2008), cert. denied, 129 S. Ct. 2778 (2009).

With respect to participants in the same charged conspiracy especially, any claim of "prejudicial spillover" does not justify severance because the evidence would be admissible at a separate trial of the moving defendant. As the Second Circuit has recognized:

> the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately. Evidence at the joint

> trial of alleged coconspirators that, because of the alleged conspiratorial nature of the illegal activity, would have been admissible at a separate trial of the moving defendant is neither spillover nor prejudicial.

*Rosa*, 11 F.3d at 341 (citations omitted). Rather, undue "prejudice" may occur "when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper. This is an unlikely occurrence when all the defendants are charged under the same conspiracy count." Salameh, 152 F.3d at 115 (citation omitted).

### B.  Analysis

Dodakian's arguments for misjoinder and severance are wholly meritless. Several recent Second Circuit decisions have affirmed that joint trials of individuals who are charged in one conspiracy count may be properly joined with individuals who are charged in a different conspiracy count, provided that the two counts are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." United States v. Attanasio, 870 F.2d 809, 815 (2d Cir.1989); see also United States v. Rittweger, 524 F.3d 171 (2d Cir. 2008) (Sotomayor, J.); United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003). In Rittweiger, for example, the Second Circuit held that individuals who were charged with participating in separate conspiracies that nonetheless were linked by a substantial entity of participants, and a common scheme, were properly joined. In Feyer, the Circuit Court found that two individuals who were charged with participating in separate but related criminal schemes, concluding that "even if the district court had tried these two defendants separately, the evidence at one trial would essentially duplicate the evidence at the other." 333 F.3d at 114.

37

Here, Dodakian cannot even claim that the two counts of the Indictment lacks "some substantial identity of facts or participants," considering that she and Bowen are charged in both counts of the Indictment.  Moreover, the Indictment, and the Government's proffer of evidence from victims and others that the Government intends to introduce at trial, demonstrate that the two schemes charged in the Indictment "arise out of a common plan or scheme" to defraud victims, and share victims and other evidence in common.  As referenced above, the Indictment explicitly lists connections between the two Counts of the Indictment, including common defendants (Dodakian and Bowen), common victims (Victim-2, for example, is referenced in both Count One and Count Two), and a common scheme (e.g., Ingram's reference to Norman's program in the recorded call referenced above and in Count Two).

Any concern, under Rule 14, that the jury will not be able to segregate the evidence among the defendants implicated in the two counts of the Indictment would be wholly speculative, and in any event, would be wholly unwarranted when Dodakian is charged in both counts of the Indictment.  First, the Second Circuit has repeatedly recognized that "the fact that evidence may be admissible against one defendant but not against another does not necessarily require a severance."  United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983).  Second, any spillover prejudice that may occur will be corrected by the Court's instruction that the jury consider the guilt of each defendant individually -- an instruction that jurors are presumed to be able to follow.  United States v. Potamitis, 739 F.2d 784, 790 (2d Cir. 1984); see also United States v. Zackson, 6 F.3d 911, 922 (2d Cir. 1993).

Finally, even assuming that a particular defendant is somehow prejudiced by joinder with a codefendant, the standard under Federal Rule of Criminal Procedure 14 is not whether there is any prejudice, but whether that prejudice "is sufficiently severe to outweigh the

judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Panza*, 750 F.2d at 1149.  The presumption in favor of joint trials thus "conserves judicial resources, alleviates the burden on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials."  *Lyles*, 593 F.2d at 191 (internal quotation marks omitted); *United States v. Corr*, 543 F.2d 1042, 1052 (2d Cir. 1976).

Accordingly, Dodakian's challenges to joinder, and her motions for severance should be denied.[17]  In the alternative, the Court should deny the defendants' motions to sever without prejudice on the grounds that they are premature.  This is because "the Court does not know how many defendants will plead before trial or how other pre-trial motions might limit the scope of the trial."  United States v. Heatley, No. S2 96 Cr. 515, 1997 WL 12961, at *4 (S.D.N.Y. Jan. 14, 1997); see also United States v. Kevin, No. 97 Cr. 963 (JGK), 1999 WL 194749, at *12 (S.D.N.Y. Apr. 7, 1999).

## IV.     CONCLUSION

For the reasons set forth above, the Government respectfully submits that defendant's pretrial motions should be denied.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:  /s/ Howard S. Master
Howard S. Master
Ryan P. Poscablo

---

[17] To the extent that a defendant does not seek a finding that he is improperly joined, or that severance is warranted, he should be deemed to have waived any challenges that he has not raised in his pretrial motions.  *See United States v. Blount*, 291 F.3d 201, 208 (2d Cir.2002).

Assistant U.S. Attorneys
(212) 637-2248/2436

<u>CERTIFICATE OF SERVICE</u>

I, Howard S. Master, declare that I am employed in the Office of the United States Attorney for the Southern District of New York, and on February 1, 2010, I caused a copy of the attached Government's Response to Defendant Robert Ingram's Motion to Suppress to be served by electronic notification to the following counsel:

        Roger Stavis, Esq.
        Joel M. Stein, Esq.
        Eric Sears, Esq.
        Seth Ginsberg, Esq.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.

Dated:      New York, New York
           February 1, 2010

                        <u>/s/ Howard S. Master     </u>
                        Howard S. Master
                        Assistant United States Attorney